***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Houser, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding, with some modification, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing on 4 February 2004 as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of The North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff-employee and defendant-employer on 9 September 1998, the date of the injury by accident giving rise to this claim.
3. The Hartford was the carrier or administrator on the risk for Vitafoam, Inc. on 9 September 1998, the date of the injury by accident giving rise to this claim.
4. Plaintiff sustained compensable injuries to his left hand and right arm on 9 September 1998.
5. Plaintiff's average weekly wage at the time of his injuries was $791.56, which yields a compensation rate of $527.73 per week.
6. Plaintiff became disabled as a result of his injuries and received total disability compensation from defendants for the period of 10 September 1998 through 25 April 1999.
7. Plaintiff returned to work for defendant-employer in a light duty job earning less than his average weekly wage, and received temporary partial disability compensation from 26 April 1999 through 19 October 2001.
8. Plaintiff continued to work for defendant-employer in a light duty job earning less than his average weekly wage from 20 October 2001 through 12 January 2002. Plaintiff submitted to defendants during this time period claims for temporary partial disability compensation totaling $3,025.86. Defendants have not paid any portion of these benefits.
9. Plaintiff, after taking an unpaid leave of absence, attempted to return to work for defendant-employer on 28 March 2002 but a dispute arose about whether defendant-employer could provide plaintiff with a job that accommodated the physical restrictions imposed by his physicians.
10. Plaintiff has not worked since 28 March 2002, and has received no total disability compensation from the defendants since 28 March 2002.
11. On 15 April 2003, the parties submitted a packet of medical records, numbered pages 0001-0102, which was admitted into the record, and marked and as Stipulated Exhibit (2). On 29 October 2003 the parties submitted additional medical records from Dr. James P. McDonald, covering the period 14 April 2003 through 4 June 2003, which were admitted into the record, and marked as Stipulated Exhibit (3).
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-four (44) years of age. Plaintiff is a legal, resident alien from Pakistan, having entered the United States in December 1991.
2. Plaintiff's education is limited, having obtained the equivalent of an eighth grade education in Pakistan. Since arriving in the United States, plaintiff has had no additional formal education. Plaintiff is able to speak and understand English, but testified he is unable to read or write English.
3. Prior to working for defendant-employer, plaintiff worked as a general laborer in Pakistan. On 19 February 1992, plaintiff began working for defendant-employer.
4. Plaintiff has held a number of positions with defendant-employer. By 9 September 1998, plaintiff had risen to the position of line operator. In that position, plaintiff was responsible for setting up, starting and overseeing the operation of a production line that converted various types of raw fiber into cushions or insulation materials. As part of his duties, plaintiff was required to replace or change cutting knives weighing up to seventy-five (75) pounds. Additionally, plaintiff would substitute for other workers on the line when they were absent. With certain jobs in this substitute capacity, plaintiff was required to push or pull heavy bales of fabric weighing hundreds of pounds.
5. On 9 September 1998, while working for defendant-employer, plaintiff sustained injuries to his left hand and right forearm when these limbs were caught by and pulled into a set of rollers. For his injuries, plaintiff was primarily treated by Dr. James P. McDonald. The injuries to plaintiff's left hand consisted mostly of lacerations to the palmer and dorsal surfaces. According to Dr. McDonald, these lacerations produced permanent external and internal scarring, which resulted in a limitation of motion in plaintiff's left hand. The injury to plaintiff's right forearm was described by Dr. McDonald as being a crush type injury. This injury resulted in a compartment syndrome, which involves significant swelling within a closed space, the pressure of which caused damage to the muscles and nerves of plaintiff's right forearm.
6. The compensability of plaintiff's injuries was admitted by defendants through the filing of an Industrial Commission Form 60 Agreement. Pursuant to the Form 60, plaintiff was paid by defendants total disability compensation for the period of 10 September 1998 through 25 April 1999.
7. On 16 April 1999, Dr. McDonald released plaintiff to return to light duty work, with restrictions of no lifting greater than twenty (20) pounds, and no repetitive use of his upper extremities. Plaintiff returned to work for defendant-employer in this light duty capacity on 26 April 1999.
8. Following his return to light duty work, plaintiff continued to receive medical attention from Dr. McDonald through 31 December 2001. Plaintiff remained under work restrictions assigned by Dr. McDonald throughout this period of treatment. On 13 November 2001, Dr. McDonald observed that plaintiff had numbness and tingling in his right upper extremity and left hand, and that he had difficulty grasping and holding on to heavy objects. Due to these symptoms, Dr. McDonald recommended that plaintiff undergo an EMG nerve conductions study.
9. Dr. M. Angela Thomas administered plaintiff's nerve conduction study on 13 November 2001. The results of this study revealed evidence of demyelinating median neuropath (meaning separation of nerve sheaths) that was affecting plaintiff's right upper extremity greater than his left upper extremity. Dr. Thomas opined that these findings were consistent with entrapment of the wrists. Additionally, Dr. Thomas noted that the study showed mild abnormalities with plaintiff's right ulnar sensory nerve, but that this was not the result of the entrapment.
10. Ms. Vickie Dennis, a plant nurse for defendant-employer, testified regarding plaintiff's duties following his return to light duty work on 26 April 1999. Ms. Dennis testified that subsequent to plaintiff's injury, he required assistance from other workers in order to be able to perform the normal duties associated with his line operator position. As examples, Ms. Dennis testified that plaintiff received assistance with a use of a stick on the line when fiber was caught that had to be removed. Additionally, it was necessary that plaintiff receive assistance from other workers when moving of the knives on the line was needed.
11. Prior to his admittedly compensable injury by accident, plaintiff normally worked as a line operator from 7:00 a.m. to 3:00 p.m., or from 7:00 a.m. to 11:00 p.m., seven (7) days per week. Following his return to work in this modified line operator position, plaintiff was unable to work as many hours due to his restrictions. Accordingly, due to non-similarity of the wages plaintiff earned prior to his injury by accident, and the limited wages he was paid following his return to light duty work, the modified line operator position was not suitable. Moreover, the modified line operator position to which plaintiff returned to work on 26 April 1999 was a make-work position in that no evidence has been presented that such an assisted position was readily available in the competitive job market. As such, the wages received by plaintiff while performing this modified line operator job were not truly indicative of any wage earnings capacity.
12. On 6 October 2001, plaintiff was moved from his modified line position to what was referred to as a utility position. In that position, plaintiff performed odd jobs in the plant that included sweeping, carrying out trash, and assisting with the operation of a picker machine. No evidence has been presented that such a utility position, one in which the worker moves between various and disconnected "odd" jobs was readily available in the competitive job market. As such, wages received by plaintiff while performing this odd job utility position were not truly indicative of any wage earnings capacity.
13. On 12 January 2002, plaintiff began an approved unpaid leave of absence for a trip home to Pakistan. Following his leave of absence, plaintiff returned to work for defendant-employer on 28 March 2002. Upon his return, defendants offered plaintiff a different utility position which required lifting or pulling garbage cans full trash bags weighing in excess of twenty to thirty (20-30) pounds, pushing or dragging of bales of fiber weighing in excess of one-hundred and fifty (150) pounds, and feeding fiber into a machine which required use of his upper extremities.
14. The duties of this second utility position, as testified to by Dr. McDonald, exceeded plaintiff's work restrictions. In fact, defendants' own May 2002 assessment of this position concluded that the physical demands of the job exceeded plaintiff's work restrictions. Therefore, the utility position offered by defendants to plaintiff on 28 March 2002 was not suitable, and any refusal of it by plaintiff was reasonable.
15. According to Dr. McDonald, as of 3 June 2003, plaintiff's work restrictions included no lifting of greater than twenty (20) pounds, occasional pushing, pulling, crawling or kneeling and no repetitive use of the right arm. With respect to the pushing and pulling restrictions, Dr. McDonald testified that occasional would mean an activity comprising less than ten percent (10%) of plaintiff's duties, or an activity that would only be performed once or twice per day. According to defendants' own job assessment, this version of a utility position required plaintiff to push or pull frequently.
16. Defendants assert that these latest work restrictions assigned by Dr. McDonald, and any disability plaintiff may now have, are the result of the conditions revealed by plaintiff's 14 November 2001 nerve conduction study. In support of this contention, defendants highlight Dr. McDonald's testimony that the abnormalities revealed by the study were new or additional problems. However, defendants' contention in this regard ignores or discounts Dr. McDonald's unequivocal testimony that the restrictions he assigned to plaintiff in June 2003 were "directly attributable" to his right forearm injury, and therefore, the result of his admittedly compensable injury by accident.
17. Since offering the plaintiff the unsuitable utility position in March 2002, defendants have not offered him any position. Further, defendants have not initiated vocational rehabilitation nor have they undertaken any job placement activities to return plaintiff to suitable employment. On his own, plaintiff has searched for work since March 2002, but has not been successful because of his injuries and restrictions.
18. As a result of his admittedly compensable 8 September 1998 injury by accident, plaintiff has been unable to earn any wages in his former position with defendant-employer or in any other suitable position in the competitive labor market for the period of 8 September 2002 and continuing through the present. Defendants would be entitled to a credit for amounts of temporary partial compensation and salary paid to plaintiff.
19. According to the Employment Security Commission documents, plaintiff received weekly unemployment benefits from 9 October 2002 through 27 May 2003 at the rate of $185.00 per week. In total, plaintiff received of $6,105.00 in unemployment benefits to which defendants are entitled to a credit.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 9 September 1998, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). As the result of his 9 September 1998 injury by accident, plaintiff sustained injuries to his left hand and right forearm. Id.
2. Due to non-similarity of the wages plaintiff earned prior to his injury by accident, and the limited wages he was paid following his return to light duty work on 26 April 1999, the modified line operator position was not suitable and not truly indicative of any wage earnings capacity. See, e.g., Dixon v. City of Durham, 128 N.C. App. 501,495 S.E.2d 380; disc. review denied, 348 N.C. 496, 510 S.E.2d 381 (1998).
3. Because plaintiff required assistance from other workers, the modified line operator position to which plaintiff returned to work on 26 April 1999 was a make work position and was, therefore, unsuitable and not indicative of any wage earnings capacity. Peoples v. Cone MillsCorporation, 316 N.C. 426, 437, 342 S.E.2d 798, 805 (1986).
4. The utility position offered by defendants to plaintiff on 28 March 2002 was unsuitable, not indicative of any wage earnings capacity, and any refusal of it by plaintiff was reasonable. N.C. Gen. Stat. § 97-32.
5. As a result of his admittedly compensable 8 September 1998 injury by accident, plaintiff is entitled to be paid by defendants ongoing total disability compensation at the rate of $527.73 per week for the period of 8 September 1998 and continuing through the present until such time as he returns to work, or until further Order of the Commission, but subject to a credit in defendants' favor for amounts of temporary partial compensation, salary, and unemployment benefits paid to plaintiff. N.C. Gen. Stat. §§ 97-29; 97-42.
6. As a result of his admittedly compensable 8 September 1998 injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred. N.C. Gen. Stat. §§ 97-25;97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $527.73 per week for the period of 8 September 1998 and continuing through the present until such time as he returns to work, or until further Order of the Commission. However, these amounts are subject to a credit in defendants' favor for amounts of temporary partial disability compensation, salary, and unemployment benefits paid to plaintiff. From the amounts having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as the result of his 8 September 1998 injury by accident.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendants shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER